## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| | § | Chapter 11 |
| In re: | § | |
| | § | Case No. 20-12522 (JTD) |
| MALLINCKRODT PLC, *et al.*, | § | |
| | § | (Jointly Administered) |
| Debtors.[1] | § | |
| | § | Relates to: Docket No. 1092 |
| | § | Hearing Date: Jan. 14, 2021 at 2:00 p.m. (ET) |
| | § | |

## OBJECTION OF THE AD HOC FIRST LIEN TERM LENDER GROUP TO THE MOTION OF THE DEBTORS TO ASSUME AND/OR ENTER INTO REIMBURSEMENT AGREEMENTS WITH RSA PARTY PROFESSIONALS

The Ad Hoc First Lien Term Lender Group[2] hereby submits this objection (the "***Objection***") to the *Motion of the Debtors to Assume and/or Enter into Reimbursement Agreements with RSA Party Professionals* [Docket No. 1092] (the "***Motion***")[3] and respectfully represents as follows:

### PRELIMINARY STATEMENT

1.     Having previously failed to convince this Court that section 363(b) of the Bankruptcy Code authorizes the Debtors to pay the fees and expenses of the RSA Parties and 14 of their professional advisors (the "***RSA Party Professionals***"), the Debtors now seek to achieve the same relief by "reframing" the request as a motion to assume and/or enter into the Reimbursement Agreements under sections 363(b) and 365(a) of the Bankruptcy Code.  In doing so, however, the

---

[1]     A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at http://cases.primeclerk.com/Mallinckrodt.  The debtors' mailing address is 675 McDonnell Blvd., Hazelwood, Missouri 63042.

[2]     The members of the Ad Hoc First Lien Term Lender Group are as reflected in the *First Amended Verified Statement of the Ad Hoc First Lien Term Lender Group Pursuant to Bankruptcy Rule 2019* [Docket No. 470].

[3]     Capitalized terms not otherwise defined herein shall have the meaning ascribed to such terms in the Motion, the RSA, or the Reimbursement Agreements (as defined in the Motion).

Debtors have largely ignored this Court's December 14, 2020 bench ruling (the "***Bench Ruling***") under which it denied, without prejudice, the Initial Fee Motion. *See Tr. of Hr.'g*, at 38:12 – 18, *In re Mallinckrodt Plc, et al.*, No. 20-12522 (JTD) (Bankr. D. Del. Dec. 14, 2020) (the "***Bench Ruling Transcript***").[4]

2.      In denying the Initial Fee Motion, the Court held that "in . . . circumstances where a debtor is seeking to pay postpetition fees and expenses of a general unsecured creditor[,] the standard to be applied in approving those payments is the standard provided for in section 503, that is[,] are the payments in recognition of a substantial contribution provided by that creditor to the bankruptcy estate." *Id.* at 34:14 – 20.  The Court also made clear that any "agreement to make [payments to the RSA Party Professionals] . . . and any order approving those payments" would need to abide by the six restrictions imposed in *Purdue Pharma* "to ensure that any payments are made solely to benefit the estate rather than individual creditors." *Id.* at 38:6 – 11.

3.      The Court further noted that, because the Debtors chose "not to . . . assume the RSA or the reimbursement agreements," the Court could not make any determination as to "whether making payments pursuant to the terms of those agreements would, in fact, be in the best interest of the estates or  . . . made solely for providing a substantial contribution to the estates and not to provide for the individual creditor groups." *Id.* at 37:21 – 38:5.

4.      It is not surprising that the Debtors have decided to take another swing at obtaining the Court's authorization to pay the fees and expenses of the RSA Party Professionals.  It is surprising, however, that the Debtors' "new" approach misses the mark entirely and fails to comply with this Court's explicit instructions in the Bench Ruling.

---

[4]      A copy of the Bench Ruling Transcript is attached as **Exhibit 1** to the *Declaration of Michael J. Cohen in Support of the Objection of the Ad Hoc First Lien Term Lender Group to the Motion of the Debtors to Assume and/or Enter into Reimbursement Agreements with RSA Party Professionals*, filed contemporaneously herewith (the "***Cohen Declaration***").

5.      *First*, the Debtors cannot assume the Prepetition Reimbursement Agreements because they are plainly not executory contracts under Third Circuit precedent.  The Debtors assert that the agreements are executory because "the Debtors' obligations (*i.e.*, payment of fees and expenses) and the Governmental Plaintiff Ad Hoc Committee's and Unsecured Notes Ad Hoc Group's performance (*i.e.*, the negotiation, documentation and implementation of a restructuring) remain unperformed."  *See* Motion, at ¶ 36.  The Debtors, however, are conflating two different agreements.  The Prepetition Reimbursement Agreements do not impose ***any*** obligations on the RSA Parties or their professionals.[5]  The obligations referred to by the Debtors are only contained in the RSA – an agreement the Debtors have explicitly decided not to assume and, therefore, one which is not relevant to the determination as to whether the Prepetition Reimbursement Agreements themselves are executory.  The plain language of the Prepetition Reimbursement Agreements makes clear that the only "obligations" of the non-Debtor parties thereto are nothing more than simple procedural conditions the RSA Party Professionals (and not the RSA Parties themselves) must meet in order to obtain payment (*i.e.*, submitting an invoice).  Accordingly, the Prepetition Reimbursement Agreements simply are not executory contracts and, therefore, cannot be assumed.[6]

6.      *Second*, and with respect to the New Reimbursement Agreements, notwithstanding the Court's ruling that the Debtors must comply with the standards set forth in section 503(b), the

---

[5]   Indeed, setting aside the fact that the RSA Party Professionals (the actual parties to the Reimbursement Agreements) have no ongoing material obligations under the Reimbursement Agreements, the RSA Parties themselves are not even a contract counterparty to the Reimbursement Agreements.

[6]   In addition, as explained in more detail below, even the conditions placed on the RSA Party Professionals' receipt of payment are not significant enough to give rise to a claim for breach by the Debtors (if left unperformed) and, accordingly, do not provide a sufficient basis to find that these agreements are executory contracts.  *See In re Columbia Gas Sys. Inc.*, 50 F.3d 233, 241, 243 (3d Cir. 1995) (holding that the failure to satisfy a simple condition to payment, or other ministerial duty is not a material obligation and does not render a contract executory).

Debtors once again argue that the business judgment standard and section 363(b) provides a statutory basis for the relief sought in the Motion (*see* Motion, at ¶¶ 10, 12, 37, 42). These arguments, however, are nothing more than an attempt by the Debtors to try and avoid scrutiny under section 503(b) by putting into a written agreement that which the Court already ruled they cannot do: pay professional fees for unsecured creditors absent a showing of a substantial contribution for each RSA Party Professional. Instead, the Debtors resort to a lengthy exposition about the benefits of the RSA. But these arguments are nothing new – they are just a rehash of the arguments the Court previously rejected.[7]

7.     *Third*, and in a similar vein, the Debtors have failed to meet their evidentiary burden in satisfying the standard articulated by the Court in the Bench Ruling. While the Debtors may have adduced evidence of some benefit to the estates from the RSA (albeit with examples that are mostly prospective in nature) (*see*, *e.g.*, Eisenberg Declaration,[8] at ¶¶ 8-10, 13), they have not provided sufficient evidence to rebut the presumption that the RSA parties and their professionals are acting in anything but the furtherance of their own self-interest. This approach runs counter to Third Circuit precedent and the Bench Ruling, in which the Court emphasized that the RSA Party Professionals could only be paid for "work that benefited the estate as a whole, not individual creditors" which is "in fact, the standard under [section] 503(b)." Bench Ruling Tr., at 36:2 – 6. Accordingly, the Debtors are required to demonstrate, ***as to each RSA Party Professional***, that such professional has rendered services which have "resulted in an actual and demonstrable benefit

---

[7]    It bears noting that, even with respect to the Prepetition Reimbursement Agreements, given that the sum and substance of such agreements is nothing more than the Debtors agreeing to pay unsecured creditor professional fees (without receiving anything in return), even if such agreements were subject to assumption under section 365(a), the Debtors should still be required to satisfy section 503(b) for the same reasons as the Court laid out in the Bench Ruling.

[8]    The "***Eisenberg Declaration***" is the *Declaration of Randall S. Eisenberg in Support of Debtors' Motion for Order Authorizing Debtors to Pay the Reasonable and Documented Fees and Expenses of the RSA Party Professionals and Granting Related Relief* [Docket No. 1121].

to the debtor's estate and the creditors" and not for services "in connection with activities . . . designed primarily to serve their own interests . . ." *In re Tropicana Ent.*, 498 F. App'x 150, 152 (3d Cir. 2012).

8.       The Debtors do not even attempt to satisfy this evidentiary standard for any individual RSA Party Professional and instead attempt to sidestep the Court's ruling by simply reiterating the importance of the RSA and the role that the RSA Party Professionals together will play in these cases – all while again declining to put the RSA in front of this Court for approval. Indeed, the Debtors go to considerable lengths (*see* Motion, at ¶¶ 42 – 52) to expound upon the benefits and the obligations enumerated in the RSA and threaten certain RSA Party Professional's nonparticipation in Mediation as a means to justify the relief sought in the Motion.[9]  As this Court recognized in the Bench Ruling, any benefits and obligations contained in the RSA cannot be considered in the context of the Motion.  Bench Ruling, at 37:21 – 38:5 ("I cannot evaluate, therefore, whether making payments pursuant to the terms of [the RSA] would, in fact, be in the best interest of the estates or whether they would be made solely for providing a substantial contribution to the estates and not to provide for the individual creditor groups.").  Accordingly, and for all of the reasons set forth herein, the Motion should be denied.

## **ARGUMENT**

I.       **The Debtors Cannot Assume the Prepetition Reimbursement Agreements under Section 365 of the Bankruptcy Code Because Such Agreements Are Not Executory Contracts.**

9.       In the Motion, the Debtors argue that the Prepetition Reimbursement Agreements "are executory contracts under the Countryman definition—*i.e.*, the Debtors' obligations (*i.e.*,

---

[9]    At the December 22, 2020 hearing before the Court, counsel to the Debtors explained that the purpose of the Motion was to "ensure that the necessary parties to the mediation will be in a position to participate."  *See, e.g.*, *Tr. of Hr.'g*, at 5:13 – 15, *In re Mallinckrodt Plc., et al.*, No. 20-12522 (JTD) (Bankr. D. Del. Dec. 22, 2020), the relevant excerpts of which are attached to the Cohen Declaration as **Exhibit 2**.

payment of fees and expenses) and the Governmental Plaintiff Ad Hoc Committee's and Unsecured Notes Ad Hoc Group's performance (*i.e.*, the negotiation, documentation and implementation of a restructuring) remain unperformed." Motion, at ¶ 36.  The Debtors further argue that the "decision to assume the Prepetition Reimbursement Agreements is a sound exercise of their business judgment" because assumption of the Prepetition Reimbursement Agreements "is critical to advancing these chapter 11 cases to a successful resolution."  *Id.*

10.    These arguments, however, are misguided.  The Prepetition Reimbursement Agreements are not executory contracts for a very simple reason: there is nothing within the four corners of such agreements that imposes ***any*** material obligations on the RSA Parties or their professionals.  The only agreement that imposes obligations on the RSA Parties is the RSA, for which the Debtors are ***not*** seeking approval.  Moreover (and not raised or discussed by the Debtors in the Motion), the only obligations that the RSA Party Professionals have (distinct from the RSA Parties themselves) under the Prepetition Reimbursement Agreements (if they are even obligations in the first instance) is to submit their invoices to the Debtors.  The failure to submit an invoice does not, however, result in a "breach" under the Prepetition Reimbursement Agreements; it is simply a condition that RSA Party Professionals must meet in order to obtain payment from the Debtors.  Even if the Court finds that requiring the RSA Party Professionals to submit an invoice is an unperformed obligation, it is ministerial – and ministerial obligations do not render a contract executory.  *See In re Columbia Gas Sys. Inc.*, 50 F.3d 233, 243 (3d Cir. 1995) (finding that any obligation to execute a release and supplemental contract under a settlement agreement were "functionally ministerial duties; they did not, nor were they supposed to, alter the relationship forged by the settlement agreement").  As such, the Debtors cannot assume the Prepetition Reimbursement Agreements under section 365(a) of the Bankruptcy Code.

**A. Courts in the Third Circuit Find that Agreements Are Executory Only If There Are Unperformed Obligations on Both Sides of the Agreement.**

11.     Section 365(a) of the Bankruptcy Code provides that the Debtors "may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a). Although the Bankruptcy Code does not define what constitutes an "executory contract," the Third Circuit follows the traditional "Countryman" test which defines an executory contract as "a contract under which the obligation of both the bankrupt and the other party to the contract are so far unperformed that the failure of either to complete performance would constitute a material breach excusing performance of the other." *Columbia Gas*, 50 F.3d at 239 (quoting *Sharon Steel Corp. v. National Fuel Gas Distrib. Corp.*, 872 F.2d 36, 39 (3d Cir. 1989)) ("[U]nless both parties have unperformed obligations that would constitute a material breach if not performed, the contract is not executory under § 365."); *In re Exide Techs.*, 607 F.3d 957, 962-63 (3d Cir. 2010) (finding that a purchase agreement was not an executory contract because the non-debtor purchaser had substantially performed under such agreement by paying the full purchase price due thereunder and by operating under the purchase agreement for ten years).

12.     In making this determination, courts look to the "four corners" of the agreement to determine "whether both parties have unperformed material obligations under the [a]greement." *In re Exide*, 378 B.R. 762, 766 (Bankr. D. Del. 2007); *see also In re Allentown Ambassadors, Inc*., 361 B.R. 422, 444 (Bankr. E.D. Pa. 2007) (stating that in determining whether a contract is executory, "the four corners of the parties' agreement are examined to determine whether both parties have material, unperformed obligations as of the commencement of the bankruptcy case"); *Shoppers World Community Ctr., L.P. v. Bradlees Stores, Inc. (In re Bradlees Stores, Inc.),* 2001 WL 1112308, at *8 (S.D.N.Y. September 20, 2001) ("The executoriness analysis examines an agreement on its face to determine whether there are material obligations that require substantial

performance from the parties.").  Further, in analyzing whether a contract is executory, courts look to the obligations of the parties as of the petition date.  *Columbia Gas*, 50 F.3d at 240 ("The time for testing whether there are material unperformed obligations on both sides is when the bankruptcy petition is filed.").

      **B.**    **The Prepetition Reimbursement Agreements Are Not Executory Because the RSA Parties and Their Professionals Have No Obligations under the Prepetition Reimbursement Agreements.**

      13.    The burden is on the Debtors to demonstrate that the Prepetition Reimbursement Agreements are executory contracts.  *Exide Technologies*, 607 F.3d at 962.  The Debtors have failed to meet their burden of demonstrating that the Prepetition Reimbursement Agreements are executory contracts under the Countryman definition and the interpretive principles employed by courts in the Third Circuit.

      14.    In support of their contention that the Prepetition Reimbursement Agreements are executory, the Debtors point to their obligations to pay fees and expenses and the RSA Parties' obligation to negotiate, document and implement a restructuring.  *See* Motion, at ¶ 36.[10]  There is, however, a very basic problem with this assertion: the Prepetition Reimbursement Agreements do

---

[10]    The Debtors also argue that courts routinely require a debtor to pay a prepetition creditor's attorneys' fees as a condition to assumption, citing *In re Williams*, No. 10-11108, 2011 WL 2533046, at *1 (Bankr. D. Del. Jun. 4, 2011) and *In re Crown Books Corp.,* 269 B.R. 12, 15-20 (Bankr. D. Del. 2001), both lease assumption cases.  *See* Motion at ¶ 35.  The Debtors further assert that "this line of cases does not subject the creditor's attorney's fees to scrutiny under section 503(b) of the Bankruptcy Code and often involve instances where the fees and expenses are incurred by the creditor in the creditor's own interest that is adverse to the estate."  *Id.* at ¶ 35, n. 7.  This argument entirely misses the point.  To begin, these two cases involved unexpired leases.  *Williams*, 2011 WL 2533046 at *1; *Crown Books*, 269 B.R. at 15.  Here, the Debtors are attempting to assume non-executory agreements.  Further, the debtors in those cases were getting a benefit through assumption – continued use of the leased premises – whereas here, the Debtors gain nothing by assuming the Prepetition Reimbursement Agreements alone (because such agreements impose no obligations on the RSA Parties).  Moreover, the Debtors are effectively seeking a blank check to pay the RSA Party Professionals' fees and expenses, whereas the courts in the cases cited by the Debtors actually limited the attorneys' fees recoverable to those compensable under the respective lease as part of the cure of such leases in connection with the assumption thereof.  *See Williams*, 2011 WL 2533046 at *2 (allowing $12,000 in fees where landlord sought in excess of $20,000); *Crown Books*, 269 B.R. at 19-20 (allowing 25% of fees sought by one landlord, and reducing a second landlord's attorneys' fees by approximately $3,000).

not contain any obligations on the part of the RSA Parties, nor are the RSA Parties themselves even a signatory to the Prepetition Reimbursement Agreements (only the RSA Party Professionals are).  The obligations of the RSA Parties *are only contained in the RSA.*  The plain language of the Prepetition Reimbursement Agreements, on the other hand, is quite clear that the RSA Parties and their professionals do not have any obligations thereunder.  The Debtors are instead trying to (once again) use the RSA itself as the basis for the relief they are seeking.  The Debtors cannot, however, point to obligations outside of the Prepetition Reimbursement Agreements as justification for the assumption of those agreements.  *See Exide*, 378 B.R. at 766 (only looking to the "four corners" of the agreement to determine whether a contract is executory); *Allentown Ambassadors*, 361 B.R. at 444 (same); *Bradlees Stores,* 2001 WL 1112308, at *8 (same); *see also* Bench Ruling Tr., at 37:21 – 38:5 (refusing to consider, in the context of the Initial Fee Motion, the RSA, because it was not presently before the Court).

15.    The Debtors, of course, completely ignore this issue and simply reiterate how, in their business judgment, assumption of the Prepetition Reimbursement Agreements makes sense.  The Debtors' business judgment, however, is beside the point.  The Bankruptcy Code does not allow a debtor to assume a non-executory contract (*i.e.*, a naked prepetition obligation) and elevate any claims thereunder to administrative expense status.  The only way for the Court to properly consider the RSA Parties' obligations under the RSA is for the Debtors to bring a motion before the Court seeking its assumption.  The Debtors, however, have strategically chosen not to seek the Court's approval of the RSA.  That being the case, the Debtors cannot "transplant" obligations under the RSA into the Prepetition Reimbursement Agreements in an attempt to turn those agreements into executory contracts when they simply are not.

16.    Further, although not raised in the Motion, to the extent that the Debtors or any other party point to any requirement that the RSA Party Professionals submit invoices to the Debtors, such an "obligation" does not make the Prepetition Reimbursement Agreements executory for two reasons.

17.    *First*, any obligation to submit an invoice to the Debtors is simply a condition to payment, not an unperformed obligation subjecting "the nonfulfilling parties to liability for damages." *Colombia Gas*, 50 F.3d at 241 (distinguishing between "the failure of a condition and a breach of a duty" because "a contracting party's failure to fulfill a condition excuses performance by the other party whose performance is so conditioned, [but] it is not, without an independent promise to perform the condition, a breach of contract subjecting the nonfulfilling party to liability for damages" (quoting *Merritt Hill Vineyards, Inc. v. Windy Heights Vineyard, Inc.*, 460 N.E.2d 1077, 1081-82 (1984))); *Exide*, 607 F.3d at 964 ("A condition subsequent is not a material obligation").  More specifically, any RSA Party Professional's failure to submit an invoice would not constitute a material breach excusing the Debtors from honoring any future invoice submitted by such RSA Party Professional.  It would merely delay the timing of payment.  It would not, however, give the Debtors a claim for breach against the RSA Party Professional, allowing them to terminate the implicated Prepetition Reimbursement Agreement.

18.    *Second*, even if the Court finds that requiring the RSA Party Professionals to submit an invoice as a condition to payment is an unperformed obligation, it is ministerial—and ministerial obligations do not render a contract executory.  *See Columbia Gas*, 50 F.3d at 243 (finding that any obligation to execute a release and supplemental contract under settlement agreement were "functionally ministerial duties; they did not, nor were they supposed to, alter the relationship forged by the settlement agreement"); *Exide*, 607 F.3d at 964 (finding that minor

obligations which "do not outweigh the factors supporting substantial performance" did not render contract executory).

19.    Similarly, the Debtors' reliance on *In re Purdue Pharma, L.P.*, No. 19-23649 (RDD) (Bankr. S.D.N.Y. Dec. 2, 2019), is misplaced.  As further discussed in paragraphs 33 and 34 below, the ad hoc governmental group's prepetition reimbursement agreement at issue in *Purdue Pharma* was arguably an executory contract because there were unperformed obligations on both sides of such agreement.  Specifically, the reimbursement agreement in *Purdue Pharma* did contain a requirement that the ad hoc group in that case take steps to support a settlement, including an obligation to "negotiate and support the terms and definitive documents associated with the Settlement, and not to take positions adverse to the Settlement, engage in litigation activities, review or investigate other matters . . . ."  *In re Purdue Pharma, L.P.*, No. 19-23649 (RDD) (Bankr. S.D.N.Y. Dec. 2, 2019) [Docket No. 394], at Ex. B.[11]  Those obligations resided in the *Purdue Pharma* reimbursement agreement itself (*i.e.*, within the four corners of the agreement). Unlike *Purdue Pharma*, however, any obligations that the RSA Parties have to support the RSA are contained within the RSA alone, and thus cannot be considered as support obligations under the Prepetition Reimbursement Agreements.  *See Exide*, 378 B.R. at 766 (only looking to the "four corners" of the agreement to determine whether a contract is executory); *Allentown Ambassadors*, 361 B.R. at 444 (same); Bench Ruling Tr., at 37:21 – 38:5.  Accordingly, the Prepetition Reimbursement Agreements are not executory contracts, and the Debtors simply cannot assume them under section 365(a) of the Bankruptcy Code.

---

[11]    A copy of the *Purdue Pharma* reimbursement agreement is attached to the Cohen Declaration as **Exhibit 3**.

II.    **The New Reimbursement Agreements Do Not Comply with the Requirements of Section 503(b) of the Bankruptcy Code and the Bench Ruling, and Cannot Be Approved under Section 363(b) of the Bankruptcy Code.**

    A. **The Bench Ruling Requires the Parties to Demonstrate a Substantial Contribution under Section 503(b) of the Bankruptcy Code.**

    20.    In the Bench Ruling, the Court found that "in the circumstances where a debtor is seeking to pay postpetition fees and expenses of a general unsecured creditor, the standard to be applied in approving those payments is the standard provided for in section 503." Bench Ruling Transcript, at 34:14 – 17. Although the Court found that the business judgment standard contains "the procedural *mechanism* for a debtor to seek the authority to make payments to unsecured creditor groups," approval of postpetition fees and expenses of a general unsecured creditor requires application of "the ***standard*** provided for in section 503, that is, are the payments in recognition of a substantial contribution provided by that creditor to the bankruptcy estate." *Id*. at 34:1 – 20 (emphasis added). As such, even if section 363(b) is considered, "payments could only be made for work that benefitted the estate as a whole, not individual creditors." *Id.* at 36:2 – 6.

    21.    The Court was also explicit that any "agreement to make [payments to the RSA Party Professionals] and any order approving those payments" would need to abide by the six restrictions imposed in *Purdue Pharma* "to ensure that any payments are made solely to benefit the estate rather than individual creditors." *Id.* at 38:6 – 11.

    22.    Ignoring the Bench Ruling and section 503(b) generally, the Debtors instead (and once again) argue that section 363(b) "provides the statutory basis for a debtor to enter into a postpetition agreement, as the Debtors propose to do with the New Reimbursement Agreements." Motion, at ¶ 37; *see also id.* at ¶ 42. Indeed, the Debtors go to considerable lengths to justify the benefits of the RSA and the RSA Party Professionals' participation in these chapter 11 cases, including with respect to the negotiation and formulation of a chapter 11 plan and the governmental

RSA Party Professionals' participation in the Mediation.  *See* Motion, at ¶¶ 42 – 52.  Nevertheless, under the standard articulated by the Court in the Bench Ruling and applicable Third Circuit precedent, the test is not whether the payment of unsecured creditors' professional fees and expenses will simply benefit the estate.  Rather, the standard is whether the creditor and its counsel provided a substantial contribution to the estate for the estate's benefit in a manner that transcends self-interest.  This ruling is consistent with long-standing Third Circuit precedent.  *See Tropicana Ent.*, 498 F. App'x at 152; *Lebron v. Mechem Financial Inc.*, 27 F.3d 937, 944 (3d Cir. 1994).

> **B. There Has Been No Evidentiary Showing of the Substantial Contribution Made by Each of the RSA Party Professionals.**

23.     Section 503(b)(4) permits payment to a professional retained by an unsecured creditor, in respect of its substantial contribution claim, only "based on the time, the nature, the extent and the value of such services" rendered on behalf of such unsecured creditor entitled to its expenses as a substantial contribution under section 503(b)(3)(D).  *See* 11 U.S.C. § 503(b)(4) (allowing as an administrative expense, "reasonable compensation for professional services rendered by an attorney or an accountant of an entity whose expense is allowable" under section 503(b)(3)(D), among others, "based on the time, the nature, the extent and the value of such service").  As such, the Court must find that *each* of the RSA Parties has actually made a substantial contribution to these chapter 11 cases, in accordance with the standard cited above, *and each* of their professionals must demonstrate, with admissible evidence, how the services that it has rendered on behalf of the RSA Parties actually benefitted the estate.  Any fees and expenses paid to the RSA Party Professionals must further be limited based on the time, nature, extent and value of services rendered in connection with the respective RSA Party making a substantial contribution.

24.    While the Debtors may have attempted to introduce certain evidence of some benefit to the estates from the RSA (*see*, *e.g.*, Eisenberg Declaration, at ¶¶ 8-10, 13), such evidence is mostly prospective in nature, and the Debtors have not otherwise provided sufficient evidence to rebut the presumption that the RSA Parties and their professionals are acting in self-interest, as is required to meet the standard under Third Circuit caselaw and the Bench Ruling.  *See Lebron*, 27 F.3d at 944 ("Creditors are presumed to be acting in their own interests until they satisfy the court that their efforts have transcended self-protection.") (internal citations omitted).  Instead of submitting evidence to satisfy this standard, the Debtors, once again, resort to a lengthy exposition about the benefits of the RSA and the general involvement of the various parties, without actually describing how each RSA Party and its professionals have rendered services that are reimbursable under sections 503(b)(3) and (b)(4) on an individual basis.

25.    Indeed, "creditors are presumed to be acting in their own interests until they satisfy the court that their efforts have transcended self-protection."  *Lebron*, 27 F.3d at 944 (stating that the relevant inquiry for substantial contribution is "whether the efforts of the applicant resulted in an actual and demonstrable benefit to the debtor's estate and the creditors," and "[i]nherent in the term 'substantial' is the concept that the benefit received by the estate must be more than an incidental one arising from activities the applicant has pursued in protecting his or her own interests" (quoting *In re Lister*, 846 F.2d 55, 57 (10th Cir. 1988))); *In re RS Legacy Corp.*, 2016 WL 1084400, at *4 (Bankr. D. Del. Mar. 17, 2016) ("A creditor is presumed to act in a self-interested manner, and as an initial matter, must show that its efforts went beyond self-protection. . . . The benefit conferred to the estate must be more than an incidental one that typically arises from the creditor protecting its own interests." (internal citations omitted)).  In this case, there has been no rebuttal of the presumption that each of the RSA Parties and their professionals have been

(and will be) performing work merely to protect their own self-interests, let alone a showing that their work has to date (or will in the future) "transcend self-interest" such that any benefit to the estate is not merely "incidental."[12]

26.     For example, although the Debtors assert that the Unsecured Notes Ad Hoc Group will play a "central role in negotiating all issues affecting the reorganized Debtors," they also note that the Unsecured Notes Ad Hoc Group "would hold the vast majority of the reorganized Debtors' equity assuming consummation of the plan contemplated by the RSA."  Motion, at ¶ 45.  Absent additional evidence, any benefit provided by the Unsecured Notes Ad Hoc Group in this regard would appear to be merely incidental and in furtherance of their own self-interests (*i.e.*, becoming the new majority owners of the Debtors' equity upon emergence).  *See Tropicana*, 498 F. App'x at 152 (denying noteholders' motion for substantial contribution because the noteholders "presented no evidence to suggest that [they] would not have prosecuted the Trustee Motion absent the promise of reimbursement by the estate . . . [and where] [they] failed, as a factual matter, to overcome the presumption that [they] had acted in [their] own self-interest.").[13]

27.     Prior to the payment of the RSA Party Professionals' fees and expenses, there must be a showing that such payment satisfies, as to each RSA Party Professional, the standard imposed

---

[12]     In the Motion, the Debtors argue that the RSA Party Professionals have already contributed to these chapter 11 cases, including by supporting an injunction against opioid related litigation during the cases, and in connection with their negotiation of the RSA prepetition.  *See* Motion, at ¶¶ 42 – 44.  There has been no showing, however, that these benefits are not merely incidental to these unsecured creditors protecting their own self-interests.  Nor are the Debtors imposing meaningful restrictions on the types of fees incurred, including particularly services rendered on behalf of the RSA Parties for which any benefit to the estate is clearly incidental to the RSA Party acting in its own self-interest.  Rather, the Motion seeks a blank check to pay the RSA Party Professionals with minimal limitations, principally an exclusion for fees incurred in prosecuting an individual claim, or in objecting to a claim (except to the extent that such claim objection is brought in connection with the prosecution of a chapter 11 plan).

[13]     Moreover, the RSA Party Professionals clearly have an expectation that they will be reimbursed by the estate (as is evidenced by the language of the Reimbursement Agreements and the relief requested by the Debtors in the Motion), a factor that weighs against finding that a creditor has transcended self-interest in making a substantial contribution for the benefit of the estates as a whole.  *See Tropicana, 498 F. App'x at 152.*

by section 503(b)(4) of the Bankruptcy Code.  And even assuming that the Debtors were merely required to demonstrate a benefit to the estate, they still have not met their evidentiary burden, as they rely too heavily on the benefits and obligations established in the RSA, which is not before the Court at this time.  *See* Bench Ruling Tr., at 37:21 – 38:5.  As such, there is simply no basis on which the Court can make such a determination.

28.    Moreover, the majority of the professional fees and expenses that the Debtors seek the authority to pay under the Motion are prospective in nature (*i.e.*, the Debtors are seeking to pay fees to be incurred by the RSA Party Professionals on a go-forward basis).  Section 503(b)(3), however, is backwards looking and "unequivocally mandates results."  *RS Legacy Corp.*, 2016 WL 1084400, at *6 ("Unlike section 330(a) where courts consider whether the services were reasonably likely to result in benefit to the estate at the time they were performed, section 503(b)(3)(D) requires a *post hoc* analysis of the actual benefit conferred to the case.").  Thus, it is not enough that the RSA Party Professionals agree to negotiate the terms of a chapter 11 plan and opioid settlement with the Debtors and other parties in interest, but they also must *actually* undertake such work and the Court must find that such work *actually* conferred a benefit to the estate.

29.    This approach is consistent with *Purdue Pharma* (discussed in more detail in paragraphs 33 and 34 below), where the court recognized that "[t]here is legitimate concern that those hopes [of successful negotiations regarding allocation of the debtors' assets] will not be fulfilled" and thus expressly restricted payment of fees for work relating to an allocation of the *Purdue Pharma* debtors' assets until the earlier of the Court's approval of an opioid settlement or confirmation of a chapter 11 plan. *Tr. of Hr.'g*, at 165:25 – 167:6, *In re Purdue Pharma, L.P.*,

No. 19-23649 (RDD) (Bankr. S.D.N.Y. Dec. 2, 2019);[14] *see also* Bench Ruling Tr., at 38:9 – 11 ("Any agreement to make such payments and any order approving those payments would need to ensure" the protections imposed by Judge Drain in *Purdue Pharma*.).

30.     Notwithstanding the Court's clear guidance on this point, the Debtors argue that any limitation that "defer[s] the consideration of reimbursement of allocation-related fees" is "inappropriate in the context of these cases."  Motion, at ¶ 57.  Yet, other than stating that they "feel strongly" that payment of fees for allocation-related work should not be deferred, the Debtors have failed to submit a legal justification as to why they not be required to comply with the Bench Ruling and *Purdue Pharma* (the very case on which they primarily rely).  The Debtors' evidence-free implication that the governmental RSA Parties will not participate in the Mediation absent assurance of payment itself demonstrates that these parties are only acting in their own self-interest.  This, of course, is in addition to the fact that these same parties ***actually did*** participate in the mediation in *Purdue Pharma* for a number of months without a guarantee of payment, and the Debtors have stated no reason why the same should not be true here.

31.     At bottom, it is too soon to tell whether the RSA Parties and their professionals will actually make a substantial contribution in these chapter 11 cases.  As the Motion makes clear, the Debtors have a potentially protracted and arduous path to confirmation of any chapter 11 plan proposed in these chapter 11 cases, given the need to settle the opioid-related allocation issues subject to the Mediation, and the need to formulate the terms of a confirmable chapter 11 plan.  While it is possible that the RSA Parties are successful in their efforts in a way that truly transcends self-interest, it is equally possible that no resolution is reached and these cases are mired in

---

[14]   A copy of the relevant excerpts of the *Purdue Pharma* hearing transcript is attached to the Cohen Declaration as **Exhibit 4**.

litigation.    Accordingly, it is simply premature to make any determination concerning the allowance of a substantial contribution claim.

> ### C.   The Cases Cited by the Debtors in Support of Their Position That the Business Judgement Standard Applies Are Inapposite to the Relief that the Debtors Request in the Motion.

32.      In support of their proposition that the business judgment standard applies to the Debtors' request to enter into the New Reimbursement Agreements, the Debtors rely on a number of cases that are inapposite to the relief requested in the Motion.  Principally, the Debtors rely on *Purdue Pharma*, *RCS Capital* and *Extraction Oil*, each of which turned on different facts and circumstances that are readily distinguishable from what is currently before the Court in these cases.

33.      In *Purdue Pharma*, the debtors commenced their chapter 11 cases without having entered into a restructuring support agreement, and the Bankruptcy Court characterized the reimbursement agreements at issue as "bringing structure to this case."  *Tr. of Hr.'g*, at 164:14-17, *In re Purdue Pharma, L.P.*, No. 19-23649 (RDD) (Bankr. S.D.N.Y. Dec. 2, 2019).  Indeed, the *only* prepetition written agreement between the debtors and the ad hoc group in *Purdue Pharma* was the reimbursement agreement.   Moreover, and quite different than the Reimbursement Agreements before the Court, under the *Purdue Pharma* reimbursement agreement, the ad hoc group was required to take certain actions in support of the debtors' restructuring efforts (provisions commonly found in a restructuring support agreement), including supporting an injunction on opioid-related litigation and forming an ad hoc committee to streamline the claims adjudication process.  *See In re Purdue Pharma, L.P.*, No. 19-23649 (RDD) (Bankr. S.D.N.Y. Dec. 2, 2019) [Docket No. 394], at Ex. B (reimbursement agreement requiring ad hoc governmental group to "negotiate and support the terms and definitive documents associated with the Settlement, and not to take positions adverse to the Settlement, engage in litigation activities,

review or investigate other matters"); *Tr. of Hr.'g*, at 75:4-9, *In re Purdue Pharma L.P.*, No. 19-23649 (RDD) (Bankr. S.D.N.Y. Nov. 27, 2019) (statements by counsel to the *Purdue Pharma* debtors characterizing the reimbursement obligations as a "fair trade for the injunction").

34.     These facts are not present here.  Unlike in *Purdue Pharma*, the Debtors (as they continuously remind the Court) have entered into the RSA, and the RSA Parties are required ***thereunder*** to support and work toward negotiating a chapter 11 plan and opioid settlement.  The Debtors, however, have strategically chosen not to assume the RSA (and they are quite explicit about it (*see* Motion, at ¶ 51)).  Although it is within the Debtors' discretion to choose to not assume the RSA, the Debtors cannot have it both ways.  Either the Debtors must subject the RSA to the scrutiny of parties in interest – and ultimately this Court – by seeking to assume it, or their entry into the Reimbursement Agreements must rise or fall on their own merits without hiding behind a document that the Debtors have explicitly chosen not to put before this Court.

35.     Similarly, the Debtors' reliance on *RCS Capital*, *Extraction Oil* and the other cases cited by the Debtors in the Motion in support thereof is misplaced.  As an initial matter, every single case cited by the Debtors involved debtors that sought to assume a restructuring support agreement (which is specifically ***not*** what is being requested in the Motion), approved the payment of unsecured creditors' fees in connection with confirmation, or were on facts that are otherwise distinguishable from these cases.

36.     For example, in *RCS Capital*, Judge Walrath considered, among other things, the payment of certain unsecured creditors' professional fees and expenses, and a transaction fee owed to the parties under a restructuring support agreement (including the unsecured creditor) for agreeing to fund $150 million in exit financing as part of a chapter 11 plan, ***in connection with the assumption of a restructuring support agreement***.  *See In re RCS Capital Corp.*, No. 16-10223

(MFW) (Bankr. D. Del. Feb. 1, 2016) [Docket No. 19] (motion to assume restructuring support

agreement).[15]   At the time of the hearing on the restructuring support agreement assumption

motion, the debtors had filed a disclosure statement and partially prepackaged chapter 11 plan

which enjoyed the support of each class of claims under the plan, and which proposed to pay the

holders of general unsecured claims, in full.   *See id.*   In deciding that motion, Judge Walrath took

a similar approach to standard articulated by this Court in the Bench Ruling, rejecting a strict

application of the business judgment standard, and finding that:

> I don't think you can use 365 to approve an agreement that violates
> the terms of the code.  But, I think that the [restructuring support]
> agreement should be approved because I think the fees are allowable
> as a substantial contribution under Section 503.  I find sufficient
> evidence to support that ruling, based on the testimony and the
> course of this bankruptcy case, to prove that this entire agreement is
> of great benefit to the Debtor. . . .  It has also locked a lot of creditors
> into approval of the plan that, again, allows a swift exit.

*Tr. of Hr.'g*, at 40:10-22,  *In re RCS Capital Corp.*, No. 16-10223 (MFW) (Bankr. D. Del. Mar.

17, 2016).[16]   Most importantly, and unlike the arguments raised by the Debtors, Judge Walrath

found that the ***evidence submitted*** at the hearing and in connection with the assumption motion

supported the debtors' entry into the restructuring support agreement, which itself provided myriad

benefits to the Debtors and their estates, as opposed to any individual creditor, and a consequence

thereof was the authorization to pay an individual unsecured creditors' fees and expenses.  *Id.* at

41:11 – 12 ("So the value of the RSA, I think, is evident on the record today.").[17]

---

[15]   A copy of the *RCS Capital* assumption motion is attached to the Cohen Declaration as **Exhibit 5**.

[16]   A copy of the relevant excerpts of the *RCS Capital* hearing transcript is attached to the Cohen Declaration as
**Exhibit 6**.

[17]   Similarly, the other cases cited by the Debtors either concerned the assumption of a restructuring support
agreement and/or came at a time when the respective debtors were on the cusp of confirmation, factors that are
not present in this case.  *See also In re Hercules Offshore, Inc.*, No. 15-11685 (KJC) (Bankr. D. Del. Aug. 24,
2015) [Docket No. 95] (seeking approval of fee payments as part of an uncontested motion to assume a
restructuring support agreement); *In re Rural/Metro Corp.*, No. 13-11952 (KJC) (Bankr. D. Del. Sept. 5, 2013)

37.     Even the final case cited by the Debtors, *Extraction Oil*, involved the payment of certain unsecured creditors' professional fees and expenses **in connection with confirmation of a chapter 11 plan**.  Indeed, the Court (Judge Sontchi) **specifically distinguished Extraction Oil from this case**:

> And I think, actually, Judge Dorsey, just last week, dealt with a related issue in the *Mallinckrodt* case, in connection with paying professional fees without going through some sort of substantial contribution analysis . . . .  Yeah, that's a little bit different because it's at the beginning of the case.  It's not at confirmation, so you really can't do a prospective substantial contribution claim . . . .

*Tr. of Hr'g* at 46:19 – 47:10, *In re Extraction Oil & Gas, Inc.*, No. 20-11548 (CSS) (Bankr. D. Del. Dec. 22, 2020).[18]

38.     Even the same exact counsel to the Unsecured Notes Ad Hoc Group, who also represented an unsecured noteholder group in *Extraction Oil*, acknowledged the difference between the two cases.  *See id.* at 69:3-9 ("[W]e actually are the ad hoc committee in the *Mallinckrodt* case before Judge Dorsey and, as Your Honor correctly pointed out, a very different situation.  **There, it's right at the beginning of the case, as opposed to here, the end under a hopefully . . . soon-to be- confirmed plan** . . .") (emphasis added)).

39.     As such, the Debtors' reliance on section 363(b) and their argument that they are only required to show a mere benefit to the estate in support of their entry into the New

---

[Docket No. 217] (same); *In re William Lyon Homes*, No. 11-14019 (CSS) (Bankr. D. Del. Dec. 29, 2011) [Docket No. 105] (same); *In re Dendreon Corp.*, No. 14-12515 (PJW) (Bankr. D. Del. Dec. 23, 2014) [Docket No. 215] (seeking approval of fee payments as part of motion to assume plan support agreements); *In re Genco Shipping & Trading Ltd.*, 509 B.R. 455, 463-64 (Bankr. S.D.N.Y. 2014) (approving payment of certain fees and expenses in connection with assumption of a restructuring support agreement in a prepackaged chapter 11 case). The final case, *Edison Mission*, is from outside the Third Circuit, and was uncontested and approved without argument or an opinion, and is thus not binding or persuasive precedent.  *See In re Edison Mission Energy*, No. 12-49219 (JPC) (Bankr. N.D. Ill. Jan. 18, 2013) [Docket No. 317] (approving an uncontested motion to assume a prepetition unsecured noteholder group's fee agreement in a case where the unsecured noteholder group was the debtor's largest creditor constituency and a controlling creditor under the debtor's plan).

[18]    A copy of the relevant excerpts of the *Extraction Oil* hearing transcript is attached to the Cohen Declaration as **Exhibit 7**.

Reimbursement Agreements, are entirely misplaced.  Rather, consistent with the Bench Ruling, the Debtors and the RSA Fee Professionals must satisfy – with admissible evidence to support the relief requested – the standard set forth in the Bench Ruling on December 14, something the Debtors clearly have failed to do here.  Accordingly, for all of these reasons, the Motion must be denied.

## **RESERVATION OF RIGHTS**

40.     The Ad Hoc First Lien Term Lender Group reserves all rights with respect to the Motion, and this Objection, including the right to be heard at any hearing related to the Motion.


[Remainder of page left intentionally blank]

**WHEREFORE**, the Ad Hoc First Lien Term Lender Group requests that the Court deny the relief requested in the Motion, and grant such other and further relief as may be just and proper.

Dated: January 12, 2021
       Wilmington, Delaware

Respectfully submitted,

*/s/ David M. Fournier*
David M. Fournier (DE No. 2812)
Kenneth A. Listwak (DE No. 6300)
**TROUTMAN PEPPER HAMILTON SANDERS LLP**
Hercules Plaza, Suite 5100
1313 N. Market Street, P.O. Box 1709
Wilmington, Delaware  19899-1709
Telephone:    (302) 777-6500
Facsimile:    (302) 421-8390
E-mail:      david.fournier@troutman.com
           ken.listwak@troutman.com

-and-

Scott J. Greenberg *(*admitted *pro hac vice)*
Michael J. Cohen *(*admitted *pro hac vice)*
Mark. A. Kirsch *(*admitted *pro hac vice)*
Matthew L. Biben *(*admitted *pro hac vice)*
**GIBSON, DUNN & CRUTCHER LLP**
200 Park Avenue
New York, New York 10166
Telephone:    (212) 351-4000
Facsimile:    (212) 351-4035
E-mail:      sgreenberg@gibsondunn.com
           mcohen@gibsondunn.com
           mkirsch@gibsondunn.com
           mbiben@gibsondunn.com

*Attorneys for the Ad Hoc First Lien Term Lender Group*